## Wetherill *versus* Neilson.

1. The purchaser takes the risk of the quality of an article purchased unless it be warranted or he be fraudulently misled as to it.

2. Mere representations as to the quality of the article sold do not constitute a warranty.

3. In a suit against the purchaser of soda ash it is not admissible for the purchaser to prove the existence of a custom of trade at Philadelphia, by which soda ash is sold upon the representation of the seller as to the percentage of alkali contained in it, and without sample or warranty—that the soda ash in question was sold and received on such representation and in pursuance of such custom, and that it was not a merchantable article.

ERROR to the District Court, *Philadelphia.*

This was an action of assumpsit, brought by Thomas Neilson against George D. Wetherill & Co., on a promissory note, of which the following is a copy.

$933 $\frac{18}{100}$          . Philadelphia, July 20, 1850.

Six months after date, we promise to pay to the order of Thomas Neilson, $933 $\frac{18}{100}$, without defalcation, value received, payable at the Bank of Northern Liberties.

GEO. D. WETHERILL & Co.

The plea was payment with leave, &c., and notice of special matter was given.

On the trial, after the note was given in evidence on the part of plaintiff, the defendant's counsel gave in evidence a bill of goods as follows:     -

Philadelphia, 20th July, 1850.

MESSRS. GEO. D. WETHERILL & Co.

Bought of Thomas Neilson, 35 casks of Soda Ash     48 pr. ct. weighing as follows: 304 to 338 (inclusive), each cask having its weight set down, and weighing in the aggregate net, 33,934 lbs. @ 2$\frac{3}{4}$ c. p. lb. $933.18.

*At six months.*

It was admitted that the note on which suit was brought was given in payment of above bill of goods made out by Thomas Neilson. The counsel of said defendants then produced William Trimble, a witness, who testified as follows:—

I am a merchandise broker, and made a sale for Thomas Neilson (the plaintiff) to the defendants of 35 casks of soda ash in July, 1850. *Neilson gave me a specification of 35 casks of soda ash afloat, Johnson's brand, of 48 degrees strength,* English test.

After several interviews with Geo. D. Wetherill & Co., they offered me 2$\frac{3}{4}$ cts. per lb. at 6 months, which Neilson accepted.

[Wetherill v. Neilson.]

Of course I notified both parties of the sale. I can't recollect all that occurred exactly in all my interviews with defendants.

I offered the soda ash to defendants, stating expressly it was 48 *degrees* English test, and that it was Johnson's brand. *The proportion of soda and degree of strength was the subject of conversation at the time of the sale and at each interview. The value of the article in the market is seriously affected by the proportion of pure soda or alkali.* I can't recollect all the conversation that took place; don't recollect if they asked the per-centage of soda or alkali; *I told them myself. I thought it necessary; it is generally sold on the representation of its strength, that is the customary mode of selling the article in this market.* Don't recollect how long a time between the first and last interview. *I was authorized by Neilson to represent to purchasers that the soda ash was 48 per cent.* There was one or two days interval between the first and last conversation with defendants. The soda ash had arrived in port, but *was afloat in the Clara Wheeler. There was no sample.* I had none. *I made the statement of 48 per cent. to induce the sale of the article.*

*Cross-examined. It is customary to sell the article in the market on the representation of per-centage.* The English test was the test at the time of its shipment, it *may* lose very slightly on the voyage in its strength. It is frequently accompanied by certificate of test, and sometimes represented by the invoice. Don't recollect that Neilson said anything about invoice or certificate, but merely told me it was 48 per cent. English test. The price I obtained from defendants was the minimum market price. The article since then has fallen in price. Don't know when the goods were delivered.

*Re-examined.* I mean by English test, that the goods were tested in England before they came here. 48 per cent. test is that of a good article; there is an article of higher quality. There are differences in different lots. *I am not aware of any different mode of testing in England from that in America. The price of the article and the value, depreciates more rapidly than the decrease of alkali—more in proportion.* I have sold a great deal of soda ash; there has been no *material* complaint as to this brand of Johnson.

He further testified that *there was no test marked on the casks.*

The defendants' counsel then offered to prove by witnesses skilled in the manufacture of glass and soap, that soda ash, which is chiefly used in said manufactures, must be as an article of use and commerce of at least 48 per cent. strength; *that the said witnesses had bought of this soda ash* in question—that it was much below 48 per cent. strength, the per centum agreed upon in the contract of sale—that the soda ash in question was not merchantable, but valueless and useless, not being in fact the article it was sold for.

[Wetherill *v.* Neilson.]

The plaintiff's counsel objected to such testimony.; it was over-ruled by the Court, and exception taken. This was the subject of the first assignment of error.

The defendants' counsel then offered to prove that the said soda ash delivered to defendants, being the consideration of the note sued upon, was not 48 per cent. English test, but was so far below it as to be practically useless for the purpose for which it is in common use in the market, and that defendants tendered *a return of the article* to the plaintiff, as soon as it was discovered that it did not correspond with the article purchased.

This testimony was overruled, and an exception taken. Second assignment.

The defendants' counsel then reoffered the above, to be followed by proof that as soon as the casks were delivered, it was observed that the marks on them *had been erased and altered.*

This was also overruled, and exception taken. Third assignment.

The defendants' counsel then offered to prove that there is a custom of trade for the port of Philadelphia, by which soda ash is sold upon the representation of the seller as to the per-centage of alkali contained in it, and without sample or warranty—that the soda ash for the price of which this suit is brought, was sold, delivered, and received on such representation, and in pursuance of such custom, and that it was not a merchantable or marketable article, and was so far below the represented per-centage as to be valueless.

This also was overruled by the Court, and an exception taken. Fourth assignment.

The defendants' counsel then reoffered the above, to be followed by proof. that the casks of soda ash when delivered to the defend-ants were scratched and marked so as to show that a former brand had been removed and another substituted.

This was also overruled, and an exception taken. Fifth assignment.

The judge instructed the jury that an express warranty or fraudulent representation must be shown by the defendants, and that in this case the plaintiff must recover upon the note as pre-sented, as no such express warranty or fraudulent representation had been proved by the defendants; and that there was no evidence to prevent the recovery by the plaintiff of the whole amount of his claim on the note.

Verdict was rendered for plaintiff for $953.85.

It was assigned for error in the first five assignments, that the Court erred in overruling the evidence offered on the part of the defendants; 7th, in charging that an express warranty or fraud must be proved in order to defeat the action.

[Wetherill *v.* Neilson.]

VIII. In charging that in this case the plaintiff must recover upon the note as presented, as no such express warranty or fraudulent representation has been proved.

IX. In taking from the jury the construction of the contract of sale. It being alleged that the contract of sale was that the soda ash should be of 48 per cent. strength, that is, contain such per centum of pure soda or alkali. That this was the consideration which induced defendants to purchase it. That it was the essence of the contract that the soda ash should be of that strength. There was no inspection of the article, as it was still stowed in the Clara Wheeler, which brought it, and it was not landed until delivered to the defendants directly from the vessel. Beside this, its quality or character could only be ascertained by testing it chemically, or by using it in manufacturing: *Chitty on Con.* (Ed. 1844) 450; 2 *Kent's Com.* (6th ed.) 485, also cited.

*Northrop* and *Campbell*, for plaintiffs in error.—It was contended that from the nature of the contract of sale it implied a warranty —that though there be no wilful misrepresentation or concealment, yet if there be an undertaking at the time of the sale that the property is such, as in a material circumstance it proves not to be, damages may be recovered: *Addison* 375; 1 *Peters C. C. Rep.* 86; *Id.* 172; *Id.* 314. A fair price implies a warranty: 3 *Yeates* 538, 541. The word *warrant* is not necessary, but it must be shown that the seller did not express a mere matter of judgment or opinion: 7 *Ser. & R.* 480–2. A sample; a description in a sale, note, advertisement, bill of parcels, or invoice, is equivalent to an express warranty that the goods are as described or represented: 3 *Rawle* 37–39.

The article must be saleable in the market; merchantable under the denomination affixed to it by the seller: 3 *Rawle* 40–1; *Id.* 168; 2 *Watts* 369. This case was not one of a naked averment, but involved a specification of quality, and an authorized representation in order to induce a sale.

As to the first assignment was cited 3 *Rawle* 40; *Id.* 168; 2 *Watts* 369. As to 2d assignment, was cited 3 *Rawle* 44; 1 *Ser. & R.* 477. 3d. The custom of a particular trade may establish an implied warranty: *Chitty on Con.* 454; 1 *W. C. C. R.* 149; 8 *Ser. & R.* 550; 3 *Rawle* 104.

. The judge took from the jury the construction of the verbal contract: 3 *Rawle* 39; 9 *Watts* 59. Under the plea of payment, damages may be set off: 6 *Bin.* 201. And in an action for the price, a warranty of the article and breach may be set off without returning the article, or giving notice to plaintiff to take it away: 1 *Ser. & R.* 478–9; 3 *Watts* 301; 5 *Id.* 52; 6 *Id.* 155; *Id.* 444.

*Guillou*, for defendant in error.—This was a case of the sale of

[Wetherill *v.* Neilson.]

soda ash on board the ship in which it was imported without warranty, and not by sample. The article was said by vendor to be 48 degrees, English test; that is to say, that when tested in England it was of that strength; Neilson had no means of knowledge as to its quality which were not equally accessible to Wetherill; he sold on his invoices and certificate, and one desiring to purchase and not satisfied with these might have asked a warranty or examined the article for himself.

It is to be observed that the defendant below did not *impeach the only allegation of his vendor by showing that the article was not of the alleged degree when tested in England.* This was the only statement of the vendor, in substance, that he had bought it as of that standard in England. It was not pretended that the assertion of Neilson was not truly based upon his purchase, the original invoice and certificate (the usual evidence); and these papers were subject to the call of Wetherill at all times.

Neilson was justified in selling the article as being of 48 degrees. It would be a hardship on importers of drugs that the vendors were to warrant that they would keep in all weathers and under all exposures.

As to the scratches, erasures, and marks upon the casks (if such there were), perhaps they may have been the marks of contents of the casks on previous occasions of their use for other purposes. The *test mark was not on the casks.* It did not appear what marks had been erased, and what substituted. There was no offer to show that Neilson had any knowledge of the alleged changes—he never saw the casks. The sale was made while these were in the hold of the vessel of importation, and they were delivered directly to Wetherill, without passing through Neilson's hands.

There was no warranty by Neilson; there is no averment of fraud on his part. He sold just as he had bought, without seeing the goods. In a contract for sale of goods without a warranty of the quality, if there be no fraud on the part of the seller he is not answerable for the quality. Willing *v.* Consequa, 1 *P. C. C.* 317; 3 *Rawle* 37; *Id.* 168; 10 *Barr* 320; 7 *Ser. & R.* 481; 4 *Johns.* 421; 2 *Bl. Com.* 451; 2 *Watts* 369; 9 *Id.* 60; 14 *Ser. & R.* 51.

It was not admitted that the soda ash was not of 48 degrees strength when tested in England. The offer was to show that it was not so when sold *by* Wetherill.

The opinion of the Court was delivered, April 21, by

LOWRIE, J.—There is no difference in principle between this case and the numerous ones referred to in the argument, all establishing the rule, that the purchaser takes the risk of the quality of the article purchased, unless it be warranted or he be fraudulently misled as to it. If mere representations were to be

[Wetherill *v.* Neilson.]

treated as part of this contract, it is not easy to see why they should not be so as to all other contracts.    And if they were, then the law would foster a spirit of litigation by encouraging every man, who is disappointed in the advantages expected from a bargain, to drown his sorrows in the excitement of an action at law.    The law repairs broken contracts, but it does not attempt to satisfy mere expectations.    It is especially important that this should be the rule as to representations of the quality of goods sold, for there is nothing on which people are more apt to differ, and nothing on which they are less apt to trust each other.

There was nothing in the representations of the agent, and what is more to the purpose, nothing in the authority given to him, that would justify a finding of either warranty or fraud, and, therefore, the Court was not wrong in saying that the defence had failed. None of the offers of evidence tended to overcome this difficulty, and they were therefore properly rejected.

As to the offer to prove a special custom in Philadelphia as to the special article of soda, if it means anything at all, it means that, when people in Philadelphia are selling soda, common English words of representation become words of warranty.    It must be conceded that such evidence has been admitted, 3 *Rawle* 101, but never without serious doubts, and we have found ourselves unable to follow the example: see Coxe *v.* Heisley, 7 *Harris* 243.    The Courts must be allowed to understand common English without the aid of witnesses.    The law is that mere representation does not constitute a warranty.    If we admit evidence of this special custom, we allow the law to be changed by the testimony of witnesses, or by the soda dealers of Philadelphia.    If parties mean to warrant, it is very easy for them to say so.    If we imply a warranty from such special customs, it is very easy to see that, theoretically, all contracts are *primâ facie* undefined; for we cannot know what special customs will be needed to aid in their interpretation.    Morality could gain nothing by the admission of such a principle into the law.    Such evidence would affect written as well as verbal contracts.    The custom, if respected at all, must be regarded as part of the contract, whether written or verbal, and then their uncertainty is apparent.

Judgment affirmed.